UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| COUPLED PRODUCTS, LLC, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 1:09-CV-00349 JD |
| HARLEYSVILLE INSURANCE COMPANY, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Now before the Court is Defendant Harleysville Insurance Company's motion for summary judgment [DE 47] on Count I of Plaintiff Coupled Products, LLC's complaint. For the following reasons, Harleysville's motion for partial summary judgment is GRANTED.

**I. Background**

At all times relevant to the complaint, Coupled Products ("CP") designed and manufactured component parts for the auto industry. At its Rochester Hills, Michigan facility, CP manufactured and assembled prototype power steering hose assemblies, which were then mass-produced in Mexico for delivery to automotive manufacturers. [DE 1 at 3; DE 48-20 at 10-11].

CP alleges that it had invested heavily in designing and developing the prototypes and tooling necessary to manufacture power steering hose assemblies. [DE 48-20 at 10-11]. Specifically, CP asserts that it had developed and patented a design for the latch plate that it incorporated into its assemblies, and had developed a unique, inexpensive process for locking the latch plate to the power steering assembly. [DE 50 at 2]. CP alleges that these designs and

processes enabled it to produce power steering hose assemblies that met its customers' requirements far more efficiently than its competitors, thus forming the basis of its competitive advantage in the marketplace. [DE 48-20 at 10]. As of December 2008, CP had a contractual relationship with both General Motors ("GM") and Mando America Corporation, wherein CP supplied power steering hose assemblies for certain GM vehicles. DE 48-9 at 8-9.

Nobel Automotive Ohio, LLC ("Nobel") was a direct competitor of CP, and leased space in the same building as CP in Rochester Hills. *Id.* at 4. In October 2008, GM asked two suppliers, including Nobel, to respond to its Request for Quote for the parts then being supplied to it by CP. [DE 48-11 at 18; DE 48-14 at 14]. On December 4, 2008, GM officials interviewed Nobel, a necessary step in approving any change of supplier. [DE 48-11 at 18; DE 48-14 at 14].

Approximately one week after this interview, on December 10, 2008, Nobel engineer Warren Maurer stole various component parts from CP's Prototype and Testing Laboratory in Rochester Hills. [DE 48-21 at 3; DE 48-29 at 6-15]. Maurer admitted to police that he stole "a handful" of latch plates, crimp shells, and inserts. [DE 48-29 at 18]. CP has suggested, but cannot confirm, that he may also have stolen tuning cables, subassembly metalawares, loop cooler in-process tubes, and tube nuts. [DE 48-20 at 13]. CP employees have testified that all of these parts were so numerous (numbering in the hundreds) that CP was unable to determine whether any had been stolen without making an inventory of parts on hand. [DE 48-10 at 7-8; DE 48-20 at 11, 13-14]. Because the inventory of parts was so numerous, the theft did not impair CP's ability to assemble and test prototypes, and these activities at the Rochester Hills facility continued unabated in the days and weeks following the theft. [DE 48-20 at 11-12, 14; DE 48-10 at 9-11; *accord* DE 48-31 at 11-12].

2

Maurer informed police that Nobel had already been approved to supply power steering assemblies prior to December 3, 2008, when, according to Maurer, Nobel began receiving money from GM and Mando. [DE 48-29 at 20]. Maurer admitted to police that he stole parts from CP because "[Nobel] needed samples to get prototypes built. [Nobel] needed components to say, 'OK, this is how it's done,'" and "didn't have time" to obtain the parts lawfully before its product was supposed to launch. *Id.* at 17. He stated that Nobel had not begun ordering components at the time of the theft, and that he therefore stole the parts rather than obtaining them commercially in order to assemble and test prototypes. *Id.* Maurer added that pressure to meet program timing deadlines prompted him to steal the component parts. *Id.* at 21. He stated that he could not have asked CP for the parts directly because Nobel was one of CP's competitors, so he did not want to notify CP of Nobel's business plans. *Id.* at 22. Maurer told police that the component parts he stole were commercially available. *Id.* at 17. However, then-president of CP Joe Kochan testified that its latch plate is patented and is available only from a limited number of sources. [DE 48-20 at 12].

On December 17, 2008, one week after the theft, GM informed CP that it was canceling the GM/Mando contract with CP. [DE 48-10 at 9; DE 50-1 at 37]. CP alleges that on December 18, 2008, GM awarded a contract for power steering assemblies to Nobel. [DE 50 at 4; *see also* DE 48-10 at 12].

CP and Harleysville do not dispute that the theft constituted a "direct physical loss or damage to property at a covered location" under the policy. [DE 48-31 at 14]. They also have stipulated to the authenticity of the Policy that was in effect at the time of the theft. [DE 48-3].

CP filed a Sworn Statement in Proof of Loss, seeking coverage for the losses it incurred

as a result of the theft, including a claim for losses due to business interruption. [DE 48-15 at 18 to DE 48-18 at 4]. Relevant to this case, CP asserts that "a large portion of CP's operations–its ability to leverage its exclusive, proprietary components and processes to manufacture and supply power steering assemblies to GM–was interrupted by Nobel's theft of CP components." [DE 50 at 8]. CP alleges that the theft resulted in the loss of its competitive advantage, which it claims constitutes a covered business interruption under the terms of the Harleysville policy.[1] *Id.*

On July 14, 2009, Harleysville denied coverage for CP's claim, asserting that CP's business was not necessarily wholly or partially interrupted by direct physical loss or damage to covered property, that there was no "restoration period" under the policy because the stolen parts were readily available, and, alternatively, that the policy excluded coverage for the cancellation of contracts. [DE 48-18 at 7-12].

CP filed this action against Harleysville on December 10, 2009. [DE 1]. Count I of the complaint alleges that Harleysville breached its contract and acted in bad faith by denying CP's business interruption claim. *Id.* at 6-7. On February 15, 2011, Harleysville filed its motion for summary judgment on Count 1 of the complaint. [DE 46]. CP filed its response on March 15, 2011 [DE 50] and Harleysville filed a reply on March 29 [DE 51].

## II. Choice of Law

Before addressing the merits of Harleysville's motion for summary judgment, the Court

---

[1] As an aside, the Court questions whether these facts indicate any connection between the theft and CP's loss of the GM/Mando contract. Nobel's theft of CP parts that were available for purchase commercially does not seem critical to the award of the contract, since the parts' design would have been readily apparent to anyone, including Nobel employees, who purchased them legally. Moreover, the facts seem to suggest that Nobel stole the parts in order to get a head start on fulfilling its imminent contract with GM/Mando, not to aid in obtaining the contract in the first place. *See* [DE 48-29 at 20; DE 50 at 3 (not challenging these factual representations)]. For all we know, the cancellation of the contract may have been the result of an increase in CP's prices. *See* [DE 48-14 at 1, 5, 13-14].

4

must first determine the law to be applied to this case.

"When a federal court hears a case in diversity, it does not necessarily apply the substantive law of the forum state; rather, it applies the choice-of-law rules of the forum state to determine which state's substantive law applies." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *accord Nautilus Ins. Co. v. Reuter*, 537 F.3d 733, 737 (7th Cir. 2008). Indiana is the forum state in this matter. As a result, the Court will apply Indiana choice-of-law rules to determine what state's substantive law governs this dispute.

Indiana courts honor reasonable choice-of-law stipulations by parties to contract cases. *Auto-Owners*, 580 F.3d at 546-47 (honoring them "regardless of whether such stipulations were made formally or informally, in writing or orally"). Here, both parties contend that Michigan law applies to the claim now before the Court, which deals with the theft of parts from CP's facility in Rochester Hills, Michigan. [DE 47 at 16; DE 50 at 6 n.9]. The Court will therefore apply Michigan law.

### III. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The party seeking summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law." *Brown v. City of Lafayette*, No. 4:08-CV-69, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party has met this burden, the nonmoving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 410 (7th Cir. 1988). To establish a genuine issue of fact, the nonmoving party must come forward with specific facts showing that there is a genuine issue necessitating trial, not "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *First Nat'l Bank of Cicero v. Lewco Secs. Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988).

If the nonmoving party fails to establish the existence of an essential element on which it bears the burden of proof at trial, summary judgment is proper–even mandated. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (citing *Celotex*, 477 U.S. at 322-23) (holding that a failure to prove one essential element "necessarily renders all other facts immaterial")). In ruling on a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999); *NUCOR Corp. v. Aceros Y Maquilas de Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

6

## IV. Discussion

### A. Insurance Policy Interpretation Conventions

"An insurance policy is much the same as any other contract. It is an agreement between the parties in which a court will determine what the agreement was and effectuate the intent of the parties." *Buczkowski v. Allstate Ins. Co.*, 526 N.W.2d 589, 594 (Mich. 1994) (citing *Eghotz v. Creech*, 113 N.W.2d 815 (Mich. 1962)). Accordingly, the court must look at the contract as a whole and give meaning to all terms. *Fresard v. Michigan Millers [Mut.] Ins. Co.*, 327 N.W.2d 286, 289 (Mich. 1982). "Any clause in an insurance policy is valid as long as it is clear, unambiguous and not in contravention of public policy." *Raska v. Farm Bureau [Mut.] Ins. Co. of Mich.*, 314 N.W.2d 440, 440 (Mich. 1982).

Where an insurer's duty to an insured is in question, a Michigan court typically employs a two-step analysis. *Buczkowski*, 526 N.W.2d at 594. First, the court determines if the policy provides coverage to the insured. If it does, the court then ascertains whether that coverage is negated by an exclusion. *Id.* In the present case, Harleysville argues both steps: first, that the policy provides no initial coverage, and second, that even if it did, that coverage would be excluded by a policy exclusion for loss due to the cancellation of contracts. [DE 47].

### B. Relevant Policy Definitions

The Harleysville policy provides the following definitions to the insured:

"We" provide the following coverage unless the coverage is excluded or subject to limitations. "We" provide the coverages described below during the "restoration period" when "your" "business" is necessarily wholly or partially interrupted by direct physical loss of or damage to property at a "covered location" . . . . [DE 47-5 at 11].

"We" do not cover any increase in loss due to the suspension, lapse, or cancellation of leases, licenses, contracts, or orders. However, "we" do cover loss during the

7

"restoration period" if the suspension, lapse, or cancellation results directly from the interruption of "your" "business". "We" do not cover any extra expense caused by the suspension, lapse, or cancellation of leases, licenses, contracts, or orders beyond the "restoration period". *Id.* at 12.

"Business" means the usual business operations occurring at "covered locations" including the tenantability of "covered locations" when the selected coverage option includes "rents". [DE 47-4 at 4].

"Restoration period" means: The time it should reasonably take to resume "your" "business" to a similar level of service starting from the date of a physical loss of or damage to property at a "covered location" that is caused by a covered peril and ending on the date: 1) the property should be rebuilt, repaired or replaced; or 2) business is resumed at a new permanent location. This is not limited by the expiration date of the policy. *Id.* at 7.

**C. Business Interruption**

The parties dispute whether the theft of parts from CP's shop resulted in an interruption of CP's "business", as defined by the policy. Under the terms of the policy, if no business interruption occurred, there would have been no restoration period because CP's business would have continued uninterrupted. And without a restoration period, the policy would not provide even initial coverage for CP's canceled contracts.

Harleysville argues that because the theft of a few fungible component parts did not interrupt CP's ability to assemble steering assembly prototypes, CP's business was not interrupted. CP disagrees. CP first points out that complete interruption of its business activities is not required for coverage under the policy–partial interruption is also covered under policy. [DE 50 at 7]. Next, CP argues that its business was partially interrupted because the parts stolen were proprietary. *Id.* at 8-10. CP claims that the theft, which delivered these parts into the hands of a direct competitor, did partially interrupt its business by depriving CP of "its ability to leverage its exclusive, proprietary components and processes"-i.e. its "competitive advantage".

8

*Id.* at 8. CP argues that it could not resume its operations to a "similar level of service" until it had developed "a new proprietary design" that its competitors were unable to replicate. *Id.* at 10-11.

As an initial matter, contrary to CP's assertion, *see id.* at 6, whether there was a restoration period is not an issue of material fact because there is no dispute as to the facts of the case. Instead, the dispositive issue is whether the loss of a business advantage qualifies as a business interruption under the terms of the policy, which is a matter of law.

It is true, as CP points out, that under the terms of the policy, business operations need not be completely suspended to trigger coverage; a partial interruption is sufficient. [DE 50 at 7; DE 47-5 at 11].[2] Harleysville does not dispute this. [DE 51 at 3]. However, the evidence before the Court establishes that the theft did not cause even a partial interruption of CP's "business", which the policy defines as CP's "usual business operations". [DE 47-4 at 4].

The undisputed facts before the Court establish that CP's usual business operations continued unabated after the theft. [DE 48-20 at 11-12, 14; DE 48-10 at 9-11; *accord* DE 48-31 at 11-12]. Joe Kochan, president of CP at the time of the theft, testified that he had no knowledge of any interruption in CP's business of developing prototypes for current or potential production parts in the week following the theft. [DE 48-10 at 9]. Similarly, Jeffrey Duncan,

---

[2] Numerous cases cited by both parties address an ambiguity apparently common in insurance policies but absent here: namely whether business operations must be totally suspended for an event to constitute a business interruption. *See Home Indem. Co. v. Hyplains Beef, L.C.*, 893 F. Supp. 987, 991-92 (D. Kan. 1995) (recognizing that holding that a complete cessation of business is required to trigger coverage under a business income coverage provision is consistent with the vast majority of cases from other jurisdictions that have examined the question of what constitutes a "suspension" or "interruption" of operations for the purposes of business interruption insurance). However, in this case, the policy language providing coverage for business operations "necessarily wholly *or partially* interrupted" eliminates the need to address this issue. *See Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn.*, 356 F.3d 850, 856-57 (8th Cir. 2004) (interpreting that policy's extra expense coverage provision does not require a cessation of business, although its loss of earnings provision does).

senior product engineer at CP at the time of the theft, testified that CP's work at Rochester Hills continued unimpeded on the day after the theft and until GM canceled its contract with CP. [DE 48-20 at 14]. In fact, the stolen parts were so numerous and fungible that CP was unable to determine how many or which parts had been stolen, and it made no special effort to replace any stolen parts because plenty were on hand to allow operations to continue. [DE 48-20 at 11, 13-14; DE 48-10 at 7-8].

CP contends, however, that its alleged loss of a competitive advantage constitutes an interruption of business sufficient to trigger policy coverage. But CP cites no case law to support such an interpretation of the policy. Harleysville, on the other hand, cited several cases to support the proposition that a loss of competitive advantage alone does not qualify as an interruption of business.

For example, in *Apartment Movers of America, Inc. v. OneBeacon Lloyd's of Texas*, No. 3:04-CV-0278-B, 2005 WL 106477 (N.D. Tex. Jan. 19, 2005), the insured's employee stole funds by destroying invoices addressed to the insured (including invoices from the Yellow Pages) and then issuing checks to himself in sums equal to the invoices. The Yellow Pages did not receive payment from the insured, and reduced the insured's advertising space and moved its advertisement to the back of the telephone book. The insured claimed lost income resulting from its smaller, less visible advertisement. The Court, however, granted summary judgment for the insurer on the business interruption claim on the ground that the insured's business operations were not interrupted, despite the fact that it might have lost sales. The Court noted that

> a survey of relevant case law demonstrates that the "necessary suspension of operations" must come, not from a lack of customer demand, but of an inability to meet customer demand. In other words, if Plaintiffs are able to fully perform their operations, there is no "necessary suspension" simply because they do not have as

10

much business as they once did.

Id. at *3.

Similarly, *Winters v. State Farm Fire and Casualty. Co.*, 73 F.3d 224 (9th Cir. 1995), supports the proposition that the loss of a competitive advantage does not constitute a business interruption when operations continue unabated. In that case, a trial attorney filed a claim with his insurer after hand saws to be used as examples in an upcoming trial were stolen from his office. The attorney claimed that as a result of this theft, he lost the suit, which would have earned him over a million dollars in contingency fees. The court found that the policy did not provide coverage, since the attorney was able to continue his law practice after the theft, albeit without the competitive advantage of exemplar hand saws at trial. It is true, as CP points out, that the terms of the *Winters* policy differ from the Harleysville policy at issue here; the *Winters* policy required a suspension of operations, while the Harleysville policy covers a whole or partial business interruption. But the *Winters* court nevertheless focused on the plaintiff's "operations", not the strength of his case relative to that of his opponent, and denied coverage because "[i]t is undisputed that there was no suspension of operations attributable to the theft." *Id.* at 229.

Numerous other cases have held that it is the inability to meet customer demand–not reduced customer demand–that triggers business interruption coverage. *See*, *e.g.*, *Ramada Inn Ramogreen, Inc. v. Travelers Indem. Co. of Am.*, 835 F.2d 812, 814-15 (11th Cir. 1988) (denying recovery to hotel owner under business interruption policy when fire damaged nearby restaurant and hotel business slowed but hotel remained operational); *Rothenberg v. Liberty Mut. Ins. Co.*, 153 S.E.2d 447, 448 (1967) (denying recovery under business interruption policy where theft of

11

merchandise resulted in loss of business; court held insured had not suffered an interruption of business, but rather a diminution in volume); *Howard Stores Corp. v. Foremost Ins. Co.*, 441 N.Y.S.2d 674 (N.Y. App. Div. 1981) (denying recovery for water damage to business where there was no actual suspension of business, but rather an alleged adverse effect on continuing sales).

Additionally, several courts have held that lost income coverage is unavailable to reimburse insureds for lost sales occurring outside a restoration period. *See, e.g.*, *Pennbarr Corp. v. Ins. Co. of N. Am.*, 976 F.2d 145 (3d Cir. 1992) (refusing to equate an "interruption of business" with an "interruption of sales"); *Rogers v. Am. Ins. Co.*, 338 F.2d 240, 243 (8th Cir. 1964) ("Plaintiff's recovery must be restricted to the loss of income that would have been earned during the reconstruction period, even though there may have been a substantial additional, but uninsured, loss consisting of reduction in income subsequent to the date of full restoration."); *Great N. Oil Co. v. St. Paul Fire & Marine Ins. Co.*, 227 N.W.2d 789, 793 (Minn. 1975) ("[T]here can be no recovery for a business-interruption loss under the quoted clause of the insurance contract, as there was no loss of earnings during the suspension period[.]").

Under this law, the Court must conclude that the theft of component parts from CP's facility did not result in a business interruption under the policy. In sum, CP's business was not interrupted at all. Immediately after the theft, CP was able and continued to perform its operations at a "similar level of service" as it did before the theft. [DE 47-4 at 7]. Thus, there was no restoration period. The undisputed evidence establishes that CP continued to perform its business operations–the development, construction, testing, and supply of power steering assemblies–to the same extent that it did before the theft.

The Court is aware of no precedent in any jurisdiction that would support interpreting business interruption coverage to cover the loss of a competitive advantage suffered as a result of a theft of intellectual property. To classify the loss of a competitive advantage as a business interruption would require insurers to subsidize insured victims of industrial espionage almost indefinitely–a result plainly contrary to both precedent and the reasonable expectations of the contracting parties.[3]

**Conclusion**

Based on the foregoing, the Court finds that there is no genuine issue of material fact as to whether Harleysville breached the terms of the insurance policy when it denied CP's claim for loss due to business interruption. Accordingly, Harleysville's motion for partial summary judgment [DE 46] is hereby GRANTED. The Court DIRECTS the Clerk to enter judgment in favor of Defendant Harleysville Insurance Company and against Plaintiff Coupled Products, LLC on Count I of the complaint. Counts II and III against Harleysville remain pending.

SO ORDERED.

ENTERED:   July 25, 2011

/s/ JON E. DEGUILIO
Judge
United States District Court

---

[3] Having concluded that the policy does not provide coverage in this instance, the Court need not consider whether any exclusions to coverage apply. *See Buczkowski*, 526 N.W.2d at 594 (discussing the two-step process for determining whether there is coverage). However, given that the Court has concluded that there was no restoration period, if the Court were to consider the exclusion, it would find that the policy exclusion for "Leases, Licenses, Contracts, or Orders", which excludes coverage for losses due to the cancellation of contracts except those losses incurred during a restoration period, [DE 47-5 at 12] would void coverage for the same reason: there was no business interruption and therefore no restoration period.